STATE OF NORTH DAKOTA, Respondent, v. F. C. LYON, Appellant.

(230 N. W. 1.)

Opinion filed March 31, 1930.

*W. C. Cull,* for appellant.

*B. A. Dickinson,* State's Attorney, and *H. E. Johnson,* Assistant States' Attorney (*Harold Shaft,* Assistant Attorney General, on oral argument), for respondent.

BURR, J. The defendant was convicted of reckless driving. A motion for new trial was denied, and he appeals from the judgment and from the order denying a new trial.

The defendant says the evidence is insufficient to justify the verdict.

The record shows the defendant was an independent salesman, taking orders for Chevrolet cars handled by the Reuter Motor Company, of Garrison, North Dakota. On June 2, 1929, K., with his wife and children, and with M., with his wife and children, was in an Oldsmobile car, that had hub caps painted red. About 9 P. M. he was driving north on highway # 6. Six or seven miles south of Minot, he overtook and passed a Ford car, and a Chevrolet coach, which "was barely coaching along." It was a new car, carried no license plate, and the spare had a cover on which there was some printing. M. said the inscription was "Reuter Motor Company, Garrison, North Dakota." The Ford passed the Chevrolet, and then the driver of the Chevrolet speeded up and overtook the Ford and K. The latter started crowding over to "his own side of the road." The driver of the Chevrolet sounded no horn, and in passing K's car struck it on the left front wheel and fender driving the Oldsmobile across the road into the ditch, against a telephone pole, and speeded on. The Oldsmobile was wrecked. Some of its passengers were rendered unconscious and seriously injured. K. did not notice how many were in the Chevrolet. The driver of the Ford car came up, and took some of the injured into Minot. In Minot a search was made for a Chevrolet car corresponding to the one involved. About 2 A. M. they found on the streets of Minot a Chevrolet car practically new, with no license plate, with a right rear fender "smashed clean back like he had hooked something," with streaks of red paint—not fresh paint—smeared on the right rear wheel and carrying a spare with a cover on which was printed "Reuter Motor Company, Garrison, North Dakota." This Chevrolet car was removed to a garage and next morning was claimed by the defendant, who came to the police station in search of his car.

One Slocum, the driver of the Ford car, testified: That this Chevrolet was the only car from Garrison ahead of him that he saw; that it was quite dark and he saw it when his lights struck it; that it was a new car, with no license plate; there was a cover on the spare tire, with the inscription—"Reuter Motor Company of Garrison, North Dakota;" the

Chevrolet passed him on highway No. 6 south of Minot, and "it turned sharp in in front" of him so as to crowd him out so he "steered kind of into the ditch and got away;" that it then slowed down to about ten miles an hour; he then passed the Chevrolet, and the Chevrolet again passed him and slowed down, repeating the same tactics; apparently trying to hold him back; he saw two in the front seat of this car and if there were any in the back seat they were not sitting up; when the Chevrolet came up to the Oldsmobile car the latter "pulled over to the right side of the road, and the Chevrolet speeded up and come right around it and when they got about even they turned right around—to the front—he cut right in front of the Oldsmobile;" he saw the Chevrolet strike the Oldsmobile and drive it into the ditch and speed on; he stopped and took some of the occupants of the Oldsmobile to Minot; next morning he saw the same Chevrolet in the Citizens' Garage in Minot (the car claimed by the defendant); he examined it and found the right rear fender bent and the hub cap damaged and with red paint on it which was not put on by any manufacturer but looked as if it had "rubbed so hard on the other one that it had scraped it off," he heard the defendant say he drove over that road and "it wasn't him" who hit the other car.

One N., police sergeant in Minot, testified that on the morning of the third of June the defendant came looking for his car, and that he and one Stanley had a conversation with the defendant; that defendant said he came from Garrison the evening before; that something had happened to his fender and the hub cap on the right rear wheel and that this was caused by "some party was driving ahead of him on the road, going north towards Minot, and that they were driving right square in the middle of the road, and would'nt give him the road, and in passing them he knocked his fender on this car." That "he said he stopped and bawled them out and said why they did not give him the road, why they did not give somebody else a chance or something to that effect;" that there was another man with the defendant and both stated "they had bumped against another car."

Stanley testified this conversation took place between 7:30 and 8 o'clock in the morning and he could not remember what the man said; that at the preliminary examination he testified that there was "red paint on the hub cap and a little green paint on the edge of the fender

of the defendant's car when he saw it that morning and he could tell from the injury to the hub cap of the defendant's car that it was hit from the front."

K. testified he was present when the defendant had the conversation with the police sergeant and heard the defendant say that after bumping the car "he stopped and got off the car and told him (the driver of the other car) what was he doing on the wrong side of the road," and "bawled the fellow out and what was he doing on the wrong side of the road."

M. who was with K. in the Oldsmobile testified: He saw two men in the Chevrolet, if there were more he did not see them; that K. swung over to the right to let the car pass; that he saw red paint on the Chevrolet in Minot; he knew this was the car that hit them; he heard the conversation with the police sergeant and that the defendant made the statement about stopping and "bawling out" the other fellow.

Mrs. A. testified she was in the defendant's car from Garrison to Minot; that they left Garrison "around eight-thirty or nine o'clock;" that there were four of them in the car; that the defendant and one Sorenson occupied the front seat, and she and one Taylor the back seat; that when from one to ten miles from Minot the defendant's car struck a car in which there were women and children; that she saw this car "swerve to the right side of the road and then straight on again," that it had lights and she heard screams from the occupants; that the defendant "passed a Ford car immediately prior to this accident;" that it was dark when this happened; that the defendant and his company got into Minot at dark; "it had been dark before we reached Minot." Later she said "it was very dark."

The defendant says that some time in the evening of June 2d he took a new Chevrolet car from the garage of the Reuter Motor Company of Garrison, North Dakota, without leave from the company; that between 6:30 and 7 in the evening he, together with S. and T. left Garrison and drove around here and there hunting gophers; that they had a 22 rifle with them for hunting gophers, but they did not take it back with them because someone must have taken it; that they were "out for an airing" and some one suggested to go to Minot, he said: "Well, there is a party that I know, he and his wife they live in Garrison, and I could name them, and I could have had them here, I drove up behind

them, he was going slow; I know him pretty well, and I thought I would have some fun with him, just like I did last Sunday, gave him a little bump, and it made him mad for a second until he found out who it was, and Mr. Nielson, I think, went a little far when he testified to what he did there," that he knew it would make the man a little sore, "and that is why I bumped into him," that all he did was to hit the rear bumper of this man's car with his front bumper. He said it was not K's car he struck; that he bumped one car only; that he got into Minot between 8:30 and 9 o'clock; that he went that evening and visited at the home of one R.; that the Chevrolet he drove had no license on it. When asked if he had told the police sergeant that he "had hit a car out on the road coming into Minot" he said "I told them I had bumped one, yes." Later he said this was half way to Max from Garrison where it happened. He admitted that he took home with him the car which was put in the garage at Minot, and which the state's witnesses say was the car that injured them. He disputed the statements of the police sergeant, Stanley, K. and M. that he had "stopped his car and bawled the fellow out that was driving the other car." He says he did not stop his car when he bumped the other car, thus agreeing with the state's witnesses when they say the offender did not stop. He does not deny he told the sergeant the damage to his fender was caused at that time, and personally gives no explanation for the injury or the paint on his hub caps. He does not say why he would not give the name of the one whose car he says he bumped, nor why he did not produce him as a witness.

One Denker, a witness for the defendant, testified: He was employed by the Reuter Motor Company; that he saw the defendant take this new car; that when that car was being unloaded from the freight car there was an accident—"it slipped away on us and damaged it a little," that the rear right wheel slipped down and the fender was "sort of hooked" and the "hub cap slipped down through the plank," that they were using jacks and chains and hoists and the jacks were painted red. The inference from his testimony is that this was how the car got the red paint; though he admits he never noticed any red paint on the hub caps. His explanation of the damage to the fender is different from the explanation given by the defendant to the police sergeant;

and he does not explain why the company permitted a "new car" held for sale to remain in that state without repairing the fender.

S., who was with the defendant, said that there were three in the defendant's car, sitting in the front seat—he, and the defendant and T. He was not asked specifically about Mrs. A. and said nothing about her. He said that after leaving Garrison they drove around, and then some one said "Let's go to Minot;" that "it was just dark" when they got to Minot; he remembered the defendant "taking his car and bumping a car driven by some one else south of Max," he did not know the party then but did now. He did not give the name, but did not say it was not K. He said it was not true the defendant stopped and "bawled out" the other driver.

T. was not produced as a witness though the defendant said he was working at that time in Garrison.

R. testified: That he lived in Minot; that on the evening of June 2d the defendant came to his place; that as near as he could tell it was "between 9 and 10 o'clock" that it was just before dark and that he was working outside and did not have lights. On cross-examination he says the reason he knew it was the 2d of June is "just because I know," because "this particular case was mentioned and I bore it in mind;" the defendant spoke to him the next day and told him that there had been an accident the previous day. Later he said it might have been the week before the 2d of June that defendant came to his place, but he did not have "that day mixed up," it was too important, and the next day after it happened the defendant told him of his troubles. He admitted the defendant frequently called there, but he could not mention any other date in particular.

Mrs. R. testified the defendant came to her home on the evening of the 2d of June about "nine or a little after;" that there were no lights on the defendant's car; that she knows this was the day because "the next day my husband came home and started telling me about that Mr. Lyon was supposed to have hit a car the night before."

This is a summary of the testimony bearing directly on the accident. The defendant admits "bumping" a car between Garrison and Minot and only one; and that he speeded on and did not stop. He claimed as his the car which at least two witnesses for the state said was the identical car that struck the Oldsmobile. His car was damaged just

where it would be ordinarily if it struck as witnesses for the state say it did; it had red paint on the part which would be exposed; there is no other explanation as to how this paint got there. One who claimed to be riding with him corroborates the state's witness, at least in part, and saw the struck car swerve. No reason whatever is shown as to why this woman, if she were not in the car, should so testify. She says she never rode with the defendant before, or after, and he admits he was acquainted with her. By the time the car was demolished and its occupants hurt the offender was well on his way to Minot. Defendant says that because M. and Slocum say they saw two in the car that struck the Oldsmobile, and Mrs. A. says there were four in the defendant's car, and defendant and S. say three, it is clear the defendant's car could not be the offender. It is quite possible both M. and Slocum saw but the two in the front seat; and did not see Mrs. A. and T. in the back seat. Just why three men would be riding in the front of a Chevrolet coach with a divisible folding set, when there was ample room in the rear seat might appeal to the jury and cause it to believe it was the car mentioned by Mrs. A. that struck K's car, and thus harmonize her testimony with that of M. and Slocum and disbelieve the defendant and his witness.

Defendant's attempt to show a different time is not effective. No one is specific as to the exact time—in the nature of the case could not be. In any event when six or seven miles south of Minot and about 9 P. M. he could have hit the Oldsmobile and yet get to R's home the time R. and his wife say he did. No one pretended to give the exact time, and days are long in June.

If the testimony of the police officer and the witnesses who heard the conversation carried on by the defendant at the police station next day be true, the defendant contradicted himself as to how he "bumped" the car he admits striking and what took place then. His failure to produce the man whose car he said he bumped, or even to give his name, is significant, especially when he said he was well acquainted with him and knew where he lived.

It must be clear therefore that the evidence is amply sufficient to sustain the verdict; in fact it is difficult to see how the jury could have arrived at any other verdict.

Fourteen specifications of error deal with the introduction of testimony.

The defendant admitted taking one of the "new cars" of the Reuter Motor Company but denied that it was this new car which had struck the Oldsmobile. To prove he was wrong the state attempted to show how many new cars had been sold by the Reuter Motor Company that season, and produced the purchasers in order to eliminate their cars. To do this the state produced as a witness Mr. Reuter with the records of the motor company and he testified that these records were kept by one Grace Ryan the bookkeeper, that they were kept day by day, and that "Ex. 2" was the record of the transactions. He could not tell that she made all the entries, because some entries were made by one Miners and by one "Mr. John Reuter who is also working for me." He could not be positive as to the handwriting of these different parties. He was then asked: "Now Mr. Reuter what does Ex. 2 contain?" The objection was there was no foundation laid. The exhibit was not introduced in evidence. The court allowed the witness to answer. He said "Ex. 2 contains sales and all record of automobiles received and sold." This ruling of the court is alleged as error. Later the witness testified "I am only president, we have a vice-president, we have a secretary under whom these books are handled, under their supervision also, not my supervision alone. I spend a large portion of my time at the elevator and not at the garage." This was after the ruling. He then told about the defendant making sales for them, and gave the names of the officers of the company and their duties, of some of the employees, etc. It was not until after four pages of such examination he was asked as to whom sales were made and gave their names. All this without objection. In addition, these purchasers, but one, were produced and testified they purchased the cars. Hence any error was without prejudice.

The next specification of error is that the court allowed the state to ask a leading question. The question was merely a repetition in the form of a question of what the witness had already testified. There was no error in this.

The witness Stanley had testified he examined the Chevrolet at the garage in Minot the morning after the accident. He was asked "Did you notice any indications of liquor in the car?" and he answered "I

didn't find any bottles." Objection was made to this after the answer was given. The court sustained it but afterwards reversed his ruling. No motion was made to strike the answer out. It is said this was error. If error it was without prejudice. There was nothing in this intimating a finding of intoxicating liquor.

On cross-examination the state asked the defendant if he did not know "that it was a violation of law to drive a vehicle on the highway without having applied for a license and without having a dealer's license on the car?" The objection was made that the defendant was not being charged with driving without a license, but was charged with reckless driving, and therefore the question was irrelevant. The court overruled the objection and the defendant answered "Yes." This was the culmination of a lengthy examination of the defendant in which the defendant himself and every one of the witnesses who saw the car said the defendant was driving without a license. The defendant had testified at length to the method of dealers in cars in securing a license for a customer, about posting a sign on the car that a license had been applied for and the necessity for it—showing an intimate knowledge of the requirements of the law. All of this testimony was without objection whatever. The objection should have been sustained, but at this stage of the proceeding there could be no possible prejudice to the defendant in the ruling. He had testified in regard to the rules and requirements for licenses and therefore it was apparent he knew it was against the law to travel without such license or without such notice.

The state produced one J. J. Murray connected with the registrar's department at Bismarck. This witness brought with him some of the record's of the department. The state examined him in regard to applications for licenses. In doing this exhibits 2 to 6 inclusive were identified. (This is not the "Exhibit 2" referred to as part of the records of the Reuter Motor Company.) There was a lengthy examination of the witness in regard to these exhibits. They deal with the applications for license made by the purchasers of the "new cars," and show they had secured licenses. All this was part of the plan of the state to eliminate these purchasers, and show that the car which struck the Oldsmobile was the one driven by the defendant. It seems that sales had been made to Messrs. Winkes, Miners, Albright, Norling and Rairdon. Exhibits 2 to 6 were the records showing these purchasers had

made application and that license had been issued to all of them before the date of the accident, and not later than May 13th. The objection was made that these exhibits were "incompetent, irrelevant, and immaterial having nothing to do with this case, having no bearing on any fact here involved. There is no one charged with driving without a license none of these men having anything to do with any point involved in this case." The court overruled the objection. There was no error in this. It was a fair inference that since these men were the only ones who purchased any of "the new cars" and had their licenses before May 13th, they would have them displayed on their cars. In addition all but one showed he was not on that road the day of the accident. As the offending car carried no license and the defendant admitted he drove a "new car" without a license, the evidence was relevant as pointing to the defendant as the offending driver.

This same witness Murray was asked if he had searched the "records in the motor vehicle department as to any registration being made for Floyd C. Lyon for any Chevrolet car." The witness had testified he was a clerk in the registrar's department, and had searched the records for this particular transaction. He said he searched for application on the part of the defendant and found none. This was objected to on the ground that the defendant was not charged with driving without a license. The question was immaterial as the defendant admitted he had not made application for license. The objection was well taken; but the ruling was harmless because all the witness showed was that there was no application, and this had been admitted already by the defendant.

The witness K. testified that on the morning of June 3d he saw in the Citizens' Garage at Minot the Chevrolet which struck his car and while he was there the defendant came in and claimed the car saying that it was his car. He was asked if the defendant said "anything about where he left it and where it came from" and this was objected to as incompetent and being hearsay. The court overruled it and the witness stated that defendant said that it was "his car that he drove and he said that he parked it there,"—that is, in the southwest part of the city "where the police got it." The question was perfectly proper in order to identify the defendant with the car. This objection was made

to similar questions addressed to two other witnesses. There was no error in these rulings.

The police sergeant was asked if he heard the defendant have conversation with anyone else in his presence—referring to the conversation regarding the car and the accident. This is objected to on the ground that this was a conversation had on the next morning and was overruled. There was no error in the ruling.

On cross-examination of the defendant the state went quite extensively into the movements of the defendant after he reached Minot, especially with his association with the two men who came with him and when they left him. There was an objection that it had no bearing on this case. A similar objection was made to further cross-examination of same import. This court has held repeatedly that a wide latitude is given to the examination of the defendant. It was proper in this case because the defendant was claiming that at the time the accident happened he was in Minot and produced witnesses to prove this. It was necessary to trace his movements for a reasonable time before and after the time he said he reached Minot, and so there was no error.

Objection was made to the examination of the defendant in regard to his "hunting," and what game he hunted from the time he left Garrison. There was no error in overruling the objection. The defendant claims he left Garrison between 6:30 and 7 and got to Minot between 8:30 and 9. He admitted he had been driving all around the country and was hunting gophers. The state had a right to find out whether he was giving the facts in regard to the time he reached Minot and in order to do this could prove the length of time he spent on the road.

Mrs. A., who claimed to have been in the car with the defendant, testified she left the car in Minot. On being examined by the defendant she was asked "where did you go after you came to Minot?" Objection was made by the state that it was "incompetent, irrelevant, and immaterial, that it was not gone into on direct examination." This objection was sustained and the defendant alleges error. She was not examined as to this on direct examination. However, the defendant did not make any attempt to show what he expected to prove. He made no offer of proof nor did he call the attention of the court to wherein the question was relevant. He cites State v. Asbury, 172 Iowa, 606, 154.

N. W. 915, as authority for the contention that his cross-examination was limited unduly. Mrs. A. was neither defendant nor prosecuting witness. The case cited dealt with the refusal of the court to give the defendant the same latitude in showing his associations as was given to the prosecuting witness. The range of cross-examination is largely within the discretion of the trial court and no prejudicial error has been shown in sustaining the objection.

The defendant says the court erred in denying his motion for a new trial. This motion is based on the insufficiency of the evidence and the rulings of the court. The evidence being clearly sufficient, and no prejudicial error being shown in the rulings, it was not error for the court to deny the new trial. The judgment of conviction and the order denying a new trial are affirmed.

BURKE, Ch. J., and NUESSLE, BIRDZELL, and CHRISTIANSON, JJ., concur.